ESTATE OF LOUIS S. LEVINE, MARY S. LEVINE, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Levine v. Commissioner
Docket No. 5937-77.
United States Tax Court
T.C. Memo 1979-118; 1979 Tax Ct. Memo LEXIS 409; 38 T.C.M. (CCH) 537; T.C.M. (RIA) 79118; March 29, 1979, Filed Donald G. Daiker, for the petitioner. Gordon C. Cook, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency in petitioner's estate tax and an addition to tax under section 6651(a) [1] of $7,743 and $1,936, respectively. *410 Concessions having been made, the issue for decision is whether the decedent's transfer of two life insurance policies to his wife within three years of the date of his death was made in contemplation of death. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Decedent, Louis S. Levine, died testate on January 13, 1971. Mary S. Levine, the decedent's wife, was appointed as executrix of his estate and was a legal resident of Palo Alto, Calif., at the time the petition was filed. She filed the Federal estate tax return with the Internal Revenue Service Center, Fresno, Calif., on June 24, 1974. At the time of decedent's death, he was 50 years of age. Prior to 1951 the decedent was awarded his Masters and Ph.D. from Stanford University in clinical psychology. In 1952 the decedent was employed as the head of the Department of Psychology at San Francisco State University, San Francisco, Calif. From 1952 until the date of his death, the decedent, in addition to his responsibilities as department head, taught on a part-time basis at the *411 University. Additionally and at various periods during that time, the decedent operated two offices in San Francisco and Palo Alto performing consulting work regarding clinical psychology. During the three-year period prior to his death, the decedent was engaged in a very rigorous schedule which necessitated his being in the East for long periods of time where he was active as co-director of the Center for Democratic Behaviours in New York City; as director of research for the Division of Rehabilitation Services in Harlem Hospital; as visiting professor at Yeshiva University; as consultant for the medical school at Columbia University; as visiting professor at Teacher's College; as a member of the President's Advisory Group at Georgetown University; and as evaluator of the Headstart program. Further, the decedent spent considerable time testifying at various Senatorial and Congressional hearings. His normal workday was from 14 to 16 hours. He did not observe weekends, or holidays, nor did he, other than on rare occasions, take a vacation. During the years preceding his death, the decedent's health in general was not good. In addition to his suffering from arthritis, the decedent *412 was first treated for aortic insufficiency in 1964. In connection with his heart condition, the decedent underwent an angiogram in 1965, and since 1967 was regularly taking medication which included nitroglycerin and furosemide. As a result of his condition, the decedent suffered pain in his back. In January 1969, the decedent was dianosed as having congestive heart failure and on February 18, 1969, he had surgery to replace a valve in his heart. On January 13, 1971, the decedent died of aortic stenosis (hardening of the arteries) and aortic insufficiency. In the early 1960's, the decedent and his wife, Mary, subscribed to two whole life insurance policies on the decedent's life in the amount of $50,000 each. Approximately five years prior to his death, the decedent and Mary met with Carl Bach (Bach), their mutual friend, insurance broker and financial counselor, to discuss some financial affairs of the decedent and his family. Among the matters discussed was Mary's desire to have adequate insurance protection for herself and the couple's three daughters in the event of the decedent's death. In this regard, Bach advised the decedent to transfer his interest in the insurance *413 policies to his wife. Eventually the decedent, at the prompting of his wife, transferred his interest in the two whole life policies on September 17, and November 4, 1968. The transfers occurred 2 years, 3 months, and 26 days and 2 years, 2 months, and 9 days, respectively, prior to his death. Due to a regular pattern of borrowing against the policies to pay the premiums, the cash surrender value of each policy at the time of the transfers was minimal. In addition to his interest in the two policies transferred to his wife, the decedent owned three other policies of insurance on his life approximating $20,000 in the aggregate. At no time did the decedent assign his interest in these policies. Respondent determined that the transfer of the decedent's interest in the two life insurance policies to his wife was a gift made in contemplation of death and that the value of the gift is includible in decedent's gross estate. OPINION Section 2035(a) provides in general that a decedent's gross estate shall include the value of all property transferred by such decedent in contemplation of death. Section 2035(b) provides that a transfer within three years of a decedent's death, unless *414 shown to the contrary, will be deemed to have been made in contemplation of death. Because the transfers here in question occurred within three years of decedent's death, the provisions of section 2035(b) place the burden on petitioner to disprove the presumption that the transfers were made in contemplation of death. The issue is essentially a question of fact requiring an examination of all relevant evidence surrounding the transfer. This inquiry must be focused on determining whether the decedent's dominant motive at the time the transfers were executed was life or death oriented. . As is typical in cases such as this, the evidence is subject to conflicting inferences. However, upon consideration of all the relevant facts, we find that the decedent's transfer of his interest in the two life insurance policies to his wife was not made in contemplation of his eventual death. Respondent, in support of his argument that the decedent's motives in transferring the policies were death related, places great weight on the decedent's deteriorating health and the nature of the property transferred, viz., life insurance *415 policies. It is certainly true as respondent contends that at the time of the transfers the decedent was in poor health. It is also true that this factor, standing alone, is indicative of a death motive. However, the critical issue is not the decedent's health, but rather his state of mind. Aside from the mere fact of the two transfers in question, we think the evidence overwhelmingly establishes that the decedent was not conscious of the seriousness of his condition and did not consider himself near death. At the time of the transfers, the decedent, 48 years of age, was a relatively young and energetic man.He would often work 14 to 16 hours a day for six or seven days a week in pursuit of his professional interests. It is clear from an examination of the entire record that the decedent was an individual who was totally dedicated to his career to the extreme that he placed it before his family, his health, and his financial affairs. [2] He was, in short, a "workaholic" -- a trait not characteristic of a man who considers himself to be seriously ill or near death. Under these circumstances, we think any inference of contemplation of death which might otherwise be drawn from his *416 physical condition is negated. For the same reasons we think decedent's health did not enter his decision to assign the policies to his wife, we likewise reject respondent's argument that the nature of the property transferred, life insurance policies, is indicative of a death related motive. The decedent was first advised by his financial counselor to transfer his interest in his life insurance policies to his wife about five years prior to his death. For about two and one-half years thereafter, he failed to act upon this suggestion. When he finally did act, it was only after continuous prompting by his wife. [3] Indeed, taking into account the decedent's total preoccupation with his work, were it not for his wife's actions, we doubt he ever would have effected the transfers. In fact, the decedent owned three other life insurance policies which he never did assign to his wife or to anyone else. In light of these facts, we cannot agree with respondent's contention *417 that the nature of the property is indicative of a death related motive.
*418 To the contrary, we think the nature of the property transferred by the decedent, at least under our facts, shows that his dominant motive was life and not death oriented. The decedent's wife, Mary, testified that she wanted to secure the maximum financial protection for herself and her three daughters in the event of her husband's death. To best attain this protection, she knew, after consultation with the family's financial counselor, that it would be desirable to have her husband, the decedent, assign his interest in his life insurance policies to her. She therefore requested on several occasions that the decedent take the steps necessary to effectuate the transfers.Eventually he did so, not because he was impelled by thoughts of his death, but because that was what his wife of 25 years desired. We think the decedent's action in this regard, to comply with the wishes of his wife, was his dominant motive in making the transfers and that such motive is connected with life and not death. See . In view of the foregoing, we hold that the decedent's transfer of the insurance policies to his wife was not in contemplation *419 of death and that the proceeds of these policies are not includable in the decedent's gross estate. Due to concessions, [4]
Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the period in issue.↩
2. The testimony at trial indicates that when the decedent was to have attended to the household duty of paying bills, he would neglect doing so to the point of jeopardizing his and his wife's credit rating.↩
3. Q * * * Now, directing your attention to the assignments of the two life insurance policies that are in question, would you explain to the Court the circumstances surrounding the assignment by your husband to you of his interest in those policies? [Q refers to Mr. Daiker and A refers to Mary S. Levine.] A Well, excuse me. I had been talking over a period of time with Mr. Bach about insurance programs, and how to best protect the interests of myself and the children. And he advised our doing this. And then it became a problem of trying to corral my husband and to get the papers signed. I could do a lot of the ground work and the preliminary investigation of what this would be. But it still would require his signature. Q Now, the actual assignments took place in September and November of 1968. Do you have any recollection of how many days or months prior to November -- or September or November of '68 that you tried to get your husband to sign the assignment forms? A Well, these things just kind of melted into each other, I mean, there were many problems. THE COURT: Pardon me, these things what? THE WITNESS: They kind of melted into each other, because it was a constant series of frustrations, trying to get practical things done. And what I recall is that I would put papers in the center of his office, which was attached to our house, where he had an office there. And then sometimes he would work on them and sometimes he wouldn't. And then, when he didn't, he would just push them aside, and they would get on the bottom of some other pile of things, and I'd have to try to get back to it. And this was always a very difficult problem. MR. DAIKER: So you don't have any independent recollection of whether it was two months or four months or six months. A I couldn't be that precise. It just was a long time. It always was a long time.↩
4. Petitioner has not proffered any argument with respect to the sec. 6651(a) addition to tax. Thus, we assume petitioner concedes its correctness subject to a reduction of such amount to the extent it reflects a percentage of a deficiency based upon a gross estate which includes the proceeds of the insurance policies at issue herein.↩